**LIBBEY GLASS, INC., Plaintiff,**

v.

**ONEIDA LTD., et al., Defendants.**

No. 3:98CV7439.

United States District Court,
N.D. Ohio,
Western Division.

July 12, 1999.

702

Douglas A. Freedman, Latham & Watkins, Chicago, IL, for Plaintiff.

Steven M. Betensky, Adam Chernichaw, White & Case, New York, N.Y., Richard M. Kerger, Daniel F. Marinik, Kerger & Kerger, Toledo, OH, Salem M. Katsh, William J.F. Roll, III, Shearman & Sterling, New York, N.Y., for Defendant.

Antoinette E. Baker, John Gueli, Alexander Min Sung Kim, Ellen R. Wiseman, Shearman & Sterling, New York, N.Y., for Counter–Claimant.

Reginald S. Jackson, Jr., Steven R. Smith, Connelly, Soutar & Jackson, Toledo, OH, Kevin C. May, Kenneth G. Schuler, Latham & Watkins, Chicago, IL, for Counter–Defendant.

## ORDER

CARR, District Judge.

This is an intellectual property case in which plaintiff Libbey Glass, Inc. (Libbey) alleges that defendants Oneida Ltd. (Oneida) and Pasabahce Cam Sanayii ve Ticaret A.S. (Pasabahce) copied protectable trade dress designs for seven lines of glassware. Pending are Oneida's and Pasabahce's motions for summary judgment (Doc. 102; Doc. 113) and Libbey's motion for summary judgment. (Doc. 125). As discussed below, Oneida's and Pasabahce's motions for summary judgment shall be granted in part and denied in part. Libbey's motion for summary judgment shall also be granted in part and denied in part.

### Background

This case involves manufacture, marketing, distribution, and sale of beverage glassware for the foodservice industry. End-users in the foodservice industry consist primarily of restaurants, bars, hotels, casinos, cruise ships, airlines, resorts, and other institutional users of foodservice products. Most end-users purchase their foodservice products from distributors, although larger end-users occasionally purchase directly from the manufacturer. Distributors purchase products from the manufacturer or from other distributors.

Libbey is in the business of designing, developing, manufacturing, and selling beverage glassware. That glassware includes the seven denominated patterns at issue in this case. Libbey began to sell these designs continuously in the indicated years: Embassy in 1965, Gibralter in 1977, Winchester in 1981, Nob Hill in 1962, Cascade in 1975, Facets in 1980, and Beer Stein in 1975. According to Oneida and Pasabahce, the origin of Libbey's glassware is signified by a scripted "L" backstamp embossed on the bottom of each glass.

Oneida recently entered the foodservice market for glassware, unveiling its own lines, which Pasabahce manufactures, in 1998. Oneida introduced several original designs and seven "knock-offs" or "look-a-likes" which correspond to the Libbey designs: Madeira to Embassy; Southwyck to Gibralter; Colby to Winchester; Branford to Nob Hill; Surf to Cascade; New Bedford to Facets; and Beer Stein to Beer Stein. Oneida and Pasabahce represent that most of Oneida's glassware, which until now has not been backstamped, will soon be embossed on the base with a distinctive mark.

Other suppliers of foodservice glassware include Anchor Hocking Foodservice, Inc. (Anchor), Cardinal U.S.A. (Cardinal), Indiana Glass, Lancaster Colony, and World Crisa (Crisa). Anchor and Crisa also produce or have produced knock-offs of six of the Libbey designs at issue in this case. Their designs correspond to Libbey's designs: Anchor's Excellency and Crisa's Monterey to Embassy; Anchor's New Orleans and Crisa's Rushmore to Gibralter; Anchor's Breckenridge to Winchester; Anchor's Beacon Hill to Nob Hill; Anchor's Saturn to Cascade; and Anchor's Beer Stein and Crisa's Heavy Sham Mug to Beer Stein. The Anchor and Crisa knock-offs predate Oneida's knock-offs.[1]

Libbey sued Oneida and Pasabahce in 1998, alleging that Oneida's knock-offs in-

fringe and dilute Libbey's protectable trade dress rights in the seven designs at issue. Libbey seeks relief for infringement under both federal and state law and for dilution under federal law only. In an earlier order (Doc. 20), I denied Libbey's motion for a preliminary injunction.

Oneida and Pasabahce now move for summary judgment as to Libbey's federal infringement, state infringement, and federal dilution claims. Libbey moves for summary judgment as to its federal and state infringement claims as well as to Oneida's and Pasabahce's affirmative defenses.

## Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings"

---

1. Oneida and Pasabahce also allege that Cardinal produced knock-offs of Libbey's Gibral-
ter and Beer Stein designs, but Libbey disputes this contention.

and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## I. Federal Lanham Act Infringement Claim

In Count One, Libbey brings a claim for infringement under the Lanham Act. 15 U.S.C. § 1125(a). The statute, in pertinent part, states:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

. . . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■ To succeed with this claim, Libbey must first identify the trade dress for which it seeks protection. Next, Libbey must establish that its trade dress is protectable by demonstrating: 1) the trade dress either is inherently distinctive or has acquired distinctiveness through secondary meaning; 2) the ornamental features of the trade dress are non-functional; and 3) a likelihood of confusion exists between the trade dress and Oneida's product. *See*

*Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

## A. Definition of Libbey's Trade Dress

Oneida and Pasabahce claim that "Libbey's definition of its trade dress as 'the product itself,' without more, is legally insufficient." (Doc. 103 at 37). According to Oneida and Pasabahce, Libbey must include packaging, backstamps, and other features in the definition.

■ Oneida and Pasabahce cite *Winning Ways, Inc. v. Holloway Sportswear, Inc.,* 913 F.Supp. 1454, 1462 (D.Kan.1996), for the proposition that Libbey may not pick and choose among a product's features when identifying the portions allegedly being infringed. I disagree: *Winning Ways* does not prohibit Libbey from choosing among product features to define its trade dress. Rather, *Winning Ways* bars a court from choosing among product features to evaluate whether the trade dress, as defined, is protectable. *Winning Ways* at 1462 ("When evaluating product configuration trade dress, a court cannot look at individual features in isolation, but rather must consider 'the whole collection of features, taken together.'").

Oneida and Pasabahce also cite *Star Markets, Ltd. v. Texaco, Inc.,* No. 95–01018, 1996 WL 780472 at *4 (D.Hawai'i 1996), for the proposition that a trade dress must be "legally identifiable." In *Star Markets,* the court determined that a grocery store's trade dress could not be comprised solely of red and white star designs. *Id.* Instead, the trade dress involved the total image of the grocery store. *See id.* The *Star Markets* court relied on a Ninth Circuit opinion which concluded that a logo, alone, was protectable as a trademark rather than as a trade dress. *Id.* (citing *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 612–13 (9th Cir.1989)).

*Vision Sports* and *Star Markets* do not create a requirement that every trade dress must be defined in a "legally identifi-

able" manner. At most, they stand for the proposition that a logo should be analyzed as a trademark rather than a trade dress. This case involves far more than a logo, and on that basis alone *Star Markets* is distinguishable. Moreover, I can find no "legally identifiable" requirement in Sixth Circuit case law or in any other trade dress case.

Oneida and Pasabahce allege that Libbey's trade dress definition is "[i]mproperly [g]errymandered" or "disingenuous." (Doc. 103 at 36, 40). In disagreement with their contentions, I find that Libbey's complaint adequately defines the trade dress for which Libbey seeks protection. (Doc. 1 at 6–14).[2] The alleged trade dress is a product configuration and is covered by the Lanham Act. *See Esercizio v. Roberts*, 944 F.2d 1235, 1245 (6th Cir.1991). For Oneida and Pasabahce to prevail, it must appear that the trade dress, as defined, does not merit protection because Libbey cannot establish distinctiveness, non-functionality, or likelihood of confusion.

Because Libbey has properly defined its trade dress in the allegedly infringing glassware, Oneida's and Pasabahce's motions for summary judgment shall be denied, and Libbey's motion for summary judgment shall be granted, as to this issue.

## B. Distinctiveness

Libbey must establish that its trade dress is distinctive. "An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. These standards apply to trade dress as well as trademarks. *See generally id.* Oneida and Pasabahce argue that Libbey establishes neither inherent nor acquired distinctiveness.

**2.** For example, Libbey describes its Embassy line as "inherently distinctive and nonfunctional, combining its free-flowing, seamless, one-piece look, touch, and feel (particularly notable where the bowl gradually slopes into

## 1. Inherent Distinctiveness

The Supreme Court has stated that a trade dress may be inherently distinctive if it is "capable of identifying a particular source of the product." *Two Pesos*, 505 U.S. at 771, 112 S.Ct. 2753. Inherent distinctiveness may provide protection "from the earliest use of the trade dress." *Id.* Traditional analysis involves the placement of a trade dress into one of several categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary, or fanciful. *See id.* at 768, 112 S.Ct. 2753 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). Trade dress fitting into one of the latter three *Abercrombie* categories (suggestive, arbitrary, or fanciful) is inherently distinctive. *See id.*

This guidance the Court provided in *Two Pesos* is not, however, tailored specifically to product configurations. The extent, accordingly, to which the *Abercrombie* categories apply in a product configuration is unclear. When dealing with product configurations, the First, Second, and Third Circuits have departed from *Abercrombie*, while the Eighth Circuit applies the *Abercrombie* categories. In other circuits, including the Sixth Circuit, the issue remains open for consideration.

## a. Circuit Court Disagreement

The Third Circuit departed first from *Abercrombie*, crafting its own test to determine when a product configuration is inherently distinctive. *Duraco Products v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431 (3d Cir.1994). "[T]o be inherently distinctive, a product configuration ... for which Lanham Act protection is sought must be (i) unusual and memorable; (ii) conceptually separable from the product; and (iii) likely to serve primarily as a designator of origin of the product." *Id.* at 1448–49.

the top of the stem) with the heavier, sturdier profile of its base, stem, and bowl for its distinctive aesthetic effect." (Doc. 1 at 6). Libbey provides a similar description for each of the other six lines of glassware.

Thereafter, the Second Circuit, which had delineated the *Abercrombie* categories for product configuration cases, created a test which "simply ask[s] whether the design [is] likely to be understood as an indicator of the product's source." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 378 (2d Cir.1997) (citing *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1008 (2d Cir.1995)).

Most recently, the First Circuit recited a test which allows a party to "attempt to show that [a] design[ ][is] so unique as to be primarily perceived as indicating the product's origin." *I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27, 41 (1st Cir.1998). In that circuit, inherent distinctiveness of a product design is determined by reference to:

> whether [the design] was a "common" basic shape or design, whether it was unique or unusual in a particular field, whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as dress or ornamentation for the goods, or whether it was capable of creating a commercial impression distinct from the accompanying words.

*Id.* at 40 (quoting *Wiley v. American Greetings Corp.*, 762 F.2d 139, 141 (1st Cir.1985)) (bracket in original).

Only the Eighth Circuit declines to deviate from *Abercrombie* in product configuration cases. *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 787–88 (8th Cir.1995).[3] The Fifth, Seventh, and Federal Circuits mention the departures from *Abercrombie*, but have avoided reaching the issue. *See Sunbeam Products, Inc. v. West Bend Co.*, 123 F.3d 246, 253 (5th Cir.1997) (citing *Duraco* favorably); *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 658 n. 3 (7th Cir.1995) (same); *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 50

U.S.P.Q.2d 1532 (Fed.Cir.1999) (finding that *Duraco* and *Knitwaves* are consistent with the principle that a trade dress which does not indicate source is generic and unprotectable). As noted above, the Sixth Circuit has yet to address inherent distinctiveness in a product configuration case.

### b. The Present Case

Libbey asks me to apply the *Abercrombie* categories in the present case. Because it selected designs that incorporated ornamental features (Zollweg Dep., Doc. 131 Ex. 79 at 69–70, 124–26, and 138–40), Libbey argues that its trade dress is "arbitrary" or "fanciful" and therefore inherently distinctive. Libbey also relies on evidence that Oneida could have chosen from thousands of other potential designs. (Ibele Dep., Doc. 131 Ex. 76 at 5–6; Joyce Dep., Doc. 131 Ex. 48 at 56). Finally, Libbey notes Oneida's alleged intent to copy. (Doc. 128 at 10–20).

■ I disagree with Libbey's fundamental premise that the *Abercrombie* categories apply in a product configuration case. Rather, I agree with the view of the First, Second, and Third Circuits that, at a minimum, a protectable product configuration must be likely to serve primarily as a designator of origin. *See I.P. Lund*, 163 F.3d at 41; *Landscape Forms*, 113 F.3d at 378; *Duraco*, 40 F.3d at 1448–49. Pursuant to *Two Pesos*, 505 U.S. at 771, 112 S.Ct. 2753, the likelihood that the product configuration serves primarily as a designator of origin must be present from the earliest use of the trade dress.

Oneida and Pasabahce argue that Libbey's trade dress is not likely to serve primarily as a designator of origin. According to Oneida and Pasabahce, Libbey's admission that its designs were "not designed to connote the source" ends my inquiry into inherent distinctiveness. I disagree. The First, Second, and Third

---

**3.** Libbey also cites *Big Top USA, Inc. v. Wittern Group*, 998 F.Supp. 30, 48 (D.Mass.1998) as a case which likewise applied the traditional *Abercrombie* test for inherent distinctiveness in a product configuration case. The precedential value of *Big Top* was abrogated by the First Circuit's decision in *I.P. Lund*, 163 F.3d 27.

Circuit standards call for a product to be *likely* to serve primarily as a designator of origin. Whether a product is consciously designed as a source indicator may be relevant, but is not dispositive.

■ Libbey neglects, however, to allege or offer evidence to establish that its trade dress, from the earliest use, served primarily as a designator of origin. Therefore, Libbey fails to raise a genuine issue of material fact about whether its trade dress is inherently distinctive.

Because, under the applicable test Libbey's trade dress is not inherently distinctive, Oneida's and Pasabahce's motions for summary judgment shall be granted as to this issue and Libbey's motion for summary judgment shall be denied.

### 2. Acquired Distinctiveness Through Secondary Meaning

■ "Secondary meaning is used generally to indicate that a mark or dress 'has come through use to be uniquely associated with a specific source.'" *Two Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. 2753. To establish secondary meaning, a trade dress owner "must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). "Primary significance" is the standard in product configuration cases as well. *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73 (1938).

■ The Sixth Circuit recognizes that direct proof of secondary meaning is difficult to obtain. *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir.1989). Instead, courts must draw reasonable inferences from a variety of factors, including consumer survey results, length and manner of use, extent of advertising, sales volume, others' efforts to copy, and testimony from consumers and distributors. *See id.* at 596; *Sprinklets Water Center, Inc. v.*

*McKesson Corp.*, 806 F.Supp. 656, 661 (E.D.Mich.1992); *see also Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291–94 (7th Cir.1998).

Libbey claims its trade dress has secondary meaning. Oneida and Pasabahce dispute Libbey's evidence. Further, they present evidence suggesting that at least some of Libbey's trade dress designs are generic and unprotectable.

#### a. Survey Results

First, Libbey relies on survey results, which are "considered the most direct and persuasive" evidence of secondary meaning. *Sprinklets*, 806 F.Supp. at 661 n. 14. The proffered survey of respondents who order glassware for restaurants pertains only to Libbey's Embassy and Gibralter glassware. (Bunge Report, Doc. 131 Ex. 60 at 1–2). According to Mr. Bunge, the surveyor, seventy-four percent of respondents associate the appearance of Embassy with Libbey, and eighty-three percent of respondents associate the appearance of Gibralter with Libbey. (*Id.* at 4–5). Of those percentages, however, only fifty-one percent of respondents associate the appearance of Embassy glassware with a single source, and only sixty-five percent of respondents associate the appearance of Gibralter glassware with a single source. (*Id.* at 3, 5). Mr. Bunge concludes from these results that there is a single source for the Embassy and Gibralter designs and that source is Libbey. (*Id.* at 6). Further, Mr. Bunge concludes that the survey results show secondary meaning among relevant consumers. (*Id.*)

Oneida and Pasabahce challenge the methodology by which Bunge reached his conclusions. They allege that the Bunge survey failed to use a control to assess the pre-existing views of survey participants. Further, they claim that his questions predisposed respondents to name a popular manufacturer. They also allege that the survey did not place the respondents in the same position in the marketplace as allegedly confused consumers. Finally, Oneida

and Pasabahce allege that Mr. Bunge misinterpreted the results.

Oneida and Pasabahce also proffer two market research studies prepared for Libbey in 1991 and 1992 by Orman Guidance Research, Inc. (Orman). The Orman studies conclude that manufacturers' brand names do not motivate glassware purchasing decisions. (1991 Orman Study, Doc. 110 Ex. GGG at 17–18; 1992 Orman Study, Doc. 110 Ex. III at 9). Libbey does not discuss the findings of either study.

The results of the Bunge survey and Orman studies are inconclusive. I cannot, accordingly, determine whether they support a finding of secondary meaning.

### b. Oneida's Intent to Copy

■ Second, Libbey relies on Oneida's intent to copy the seven glassware designs. Libbey claims that intent to copy, alone, is sufficient to establish secondary meaning. I disagree. In the Sixth Circuit, intentional copying only raises a presumption of secondary meaning. *Esercizio*, 944 F.2d at 1239 ("secondary meaning in this case can be *presumed* from [defendant's] admissions that he intentionally copied" (emphasis added)). This presumption is not irrebuttable.

The Sixth Circuit has explained that the presumption exists because "[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *Id.* (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960)) (bracket in original). This suggests that proof of a "logical reason" other than an attempt to capitalize on secondary meaning would rebut the presumption. *Id.* at 1239.

Oneida and Pasabahce offer a "logical reason" for copying. Essentially, they claim that because replacement sales make up a large portion of the glassware market, production of knock-off glassware is a common method of capturing replacement sales without having to make initial sales.

This reasoning successfully rebuts the presumption of secondary meaning.

### c. Long-term Use

Third, Libbey relies on consistent, long-term use of its trade dress. Under the Lanham Act, exclusive and continuous use of a trade dress for "the five years before the date on which the claim of distinctiveness is made" is prima facie evidence of secondary meaning. 15 U.S.C. § 1052(f); *see also Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753 ("the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection"). According to Libbey, each glassware line enjoyed continuous and exclusive use for a period of at least five years.

Libbey, however, admits that such use was not exclusive for the five year period "before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f). Knock-offs by other manufacturers of every line except one have been introduced at various times: Embassy in 1981; Gibralter in 1982; Winchester in 1996; Nob Hill in 1990; Cascade in the early 1990's; and Beer Steins in 1990. (Doc. 128 at 44–45). Only the Facets line has enjoyed continuous and exclusive use since 1980. Thus, a prima facie case of secondary meaning arises only for the Facets line.

### d. Promotion and Sales

Fourth, Libbey relies on its promotional efforts and the resulting sales of its glassware. According to Libbey, its glassware lines are consistently featured and displayed in catalogs, industry trade shows, and advertisements. (Ibele Dep., Doc. 131 Ex. 72 at 132; Meier Dep., Doc. 129 Ex. 1 at 78–79; Blaylock Dep., Doc. 130 Ex. 15 at 61). Advertising and sales volume, while relevant, are not sufficient, without more, to establish secondary meaning. *See Burke–Parsons–Bowlby*, 871 F.2d at 596.

Oneida and Pasabahce do not dispute this evidence. Therefore, promotion and sales weigh in favor of finding secondary meaning.

### e. Testimony

Fifth, Libbey relies on testimony from distributors and end-users. Libbey points to deposition testimony of several restaurant operators who associate the appearance of Libbey's glassware patterns with Libbey. (Mancy Dep., Doc. 129 Ex. 9 at 52, 81, 107; Williams Dep., Doc. 130 Ex. 14 at 81, 83, 116; Murphy Dep., Doc. 129 Ex. 10 at 69–71; Packo Dep., Doc. 129 Ex. 11 at 65; Kamilaris Dep., Doc. 131 Ex. 73 at 53–54, 61–62). Libbey also points to deposition testimony of several distributors who associate the lines at issue with Libbey. (DeMarco Dep., Doc. 131 Ex. 74 at 58–59; Blaylock Dep., Doc. 130 Ex. 15 at 100, 203; Keck Dep., Doc. 129 Ex. 7 at 54–56, 87–89; Larson Dep., Doc. 131 Ex. 75 at 109).

This testimony is inconclusive. While the distributors and end-users associate the glassware with Libbey, the testimony is ambiguous about whether they associate the glassware *only* with Libbey. As discussed above, a protectable trade dress must be associated with one source, not multiple sources. For example, Mr. Kamilaris looked at an unmarked glass and said that it "[l]ooks like a Gibralter." (Kamilaris Dep., Doc. 131 Ex. 74 at 53). Yet when asked if he could identify the manufacturer of the glass, he answered "no." (*Id.* at 54). Mr. Kamilaris's testimony suggests that glasses shaped like Libbey's Gibralter line may be associated with more than one source. The other testimony is similarly ambiguous.

### f. Generic

Finally, Oneida and Pasabahce present evidence (the two Orman Studies, which Libbey does not discuss) suggesting that at least some of Libbey's designs are generic and thus by definition do not indicate a single source. *See Sunrise Jewelry,* 175 F.3d 1322, 50 U.S.P.Q.2d 1532 (discussing why generic trade dress is unprotectable). The 1991 Orman Study respondents were aware of other manufacturers who sold glassware very similar to Libbey's. (1991 Orman Study, Doc. 110 Ex. GGG at 16). Further, respondents replaced broken glassware with "patterns of other stemware manufacturers that were close to what they had." (*Id.* at 50).

The cover letter of the 1992 Orman Study states that the research was "addressed to defining the attributes of a new bar glassware line to step into the Gibralter slot which is being eroded by cheap knockoffs." (1992 Orman Study Cover Letter, Doc. 110 Ex. FFF). Further, the report describes the Gibralter design as "generic" in several places. (1992 Orman Study, Doc. 110 Ex. III at 12, 14).

### g. Summary

In conclusion, any presumption of secondary meaning is rebutted, and the finder of fact must weigh the Bunge Survey, Orman Studies, promotion and sales evidence, and distributor and end-user testimony. Libbey must establish not only that end-users and distributors associate the trade dress with Libbey, but that they associate the trade dress *only* with Libbey. *See Two Pesos,* 505 U.S. at 766 n. 4, 112 S.Ct. 2753 (stating that secondary meaning indicates association with a "specific source").

■ Because I am unable to determine conclusively whether distributors and end-users associate Libbey's trade dress only with Libbey, there is a genuine issue of material fact about whether the dress has secondary meaning. Oneida's, Pasabahce's, and Libbey's motions for summary judgment are denied as to this issue.

### C. Non-functional

■ Next, Libbey must establish that its trade dress is non-functional. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Esercizio,* 944 F.2d at 1246 (citing *Inwood*

*Labs.,* 456 U.S. at 850 n. 10, 102 S.Ct. 2182). Only non-functional trade dress is protectable. *See Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753.

### 1. Test for Non-functionality

Libbey argues that its glassware designs, because they are chosen "for beauty" rather than "utility," are non-functional as a matter of law. (Doc. 126 at 22). According to Libbey, *Esercizio* stands for the proposition that trade dress is protectable despite "aesthetic functionality;"[4] only trade dress with "utilitarian functionality" is unprotectable. (*Id.* at 23–24).

While I agree that *Esercizio* rejects the "aesthetic functionality" test as a method for denying trade dress protection, I do not agree that the Sixth Circuit has adopted a "utilitarian functionality" test. Rather, there is a dearth of Sixth Circuit case law discussing functionality. Consequently, I look to other circuits for guidance.

A Second Circuit decision dealing with china patterns informs my analysis of the present case. *Villeroy & Boch Keramische Werke K.G. v. THC Systems, Inc.,* 999 F.2d 619 (2d Cir.1993). In *Villeroy & Boch,* the court addressed a situation where THC Systems allegedly copied Villeroy & Boch's hotel china pattern, which was known as the Basket design. *See id.* at 620. THC claimed that because hotels buy china only once every seven years, an inability to copy foreclosed THC from providing replacement china with the Basket design. *See id.* at 621. The court found that while

> buying patterns in the hotel china market may make it difficult for THC to persuade a hotel to switch to a new

pattern once it has started with the Basket design, ... THC has not made the necessary showing that it is at a significant competitive disadvantage in making the initial sale without the basket pattern.

*Id.* Thus, the Second Circuit held that hotel china is not functional as a matter of law. *Id.* at 622. THC still had the opportunity, on remand, to show that the Basket design was necessary to compete in the hotel china market. *See id.* The court referred to this analysis as the "market foreclosure test for functionality." *See id.* at 621.

The Second Circuit's reasoning in *Villeroy & Boch* is very persuasive and is consistent with the prevailing theory of functionality in most courts. *See* Mitchell M. Wong, The Aesthetic Functionality Doctrine and the Law of Trade–Dress Protection, 83 CORNELL L. REV. 1116, 1142–52 (1998). Moreover, *Villeroy & Boch* is factually similar to the present case. In the absence of contrary Sixth Circuit precedent, I shall apply the "market foreclosure test for functionality."

### 2. Application of Market Foreclosure Test for Functionality

First, I must define the relevant market for the glassware at issue. None of the parties dispute that the market consists of foodservice distributors and end-users who purchase glassware.

Next, I must decide whether Oneida and Pasabahce present any evidence that Oneida's use of Libbey's glassware designs is necessary for competition. In this market, income from sales of replacement glassware substantially exceeds income from initial sales of glassware.[5] Once a custom-

---

**4.** The *Esercizio* court describes the "aesthetic functionality" test as a determination of whether a design is functional because it is "an important ingredient in the commercial success of the product" as opposed to "a mere arbitrary embellishment, a form of dress for the goods primarily adopted for purposes of identification and individuality and, hence, unrelated to basic consumer

demands in connection with the product...."
*Esercizio,* 944 F.2d at 1246 (quoting *Pagliero v. Wallace China Co.,* 198 F.2d 339, 343 (9th Cir.1952)).

**5.** "Initial sales" refers to purchases of a new design of glassware, regardless of whether the manufacturer already has provided glasses of

er purchases glasses of a particular design, it is advantageous for that customer to replace broken glassware with glasses of the same design. Where that design is available from only one manufacturer, that manufacturer will be the sole supplier to that customer, and that manufacturer will benefit accordingly.[6]

### a. Competition for Replacement Sales

In view of the importance of replacement sales to the glassware industry, Oneida and Pasabahce claim that Oneida must be able to sell copies of Libbey's designs to compete effectively. Otherwise, the argument continues, Oneida's ability to enter the market and compete successfully will be limited to the smaller segment of the market represented by initial sales.

Though Oneida and Pasabahce's argument appears plausible at first glance, on further consideration I find it unpersuasive. Absent the ability lawfully to copy a competitor's designs, a supplier's overall market share depends, ultimately, on its success in obtaining initial sales. If the manufacturer produces glasses that are competitively superior (i.e., less expensive, more attractive and durable, and available when needed), it will succeed in making initial sales. As it does so, its market share for replacement glassware necessarily will increase.

To be sure, Oneida's ability quickly to capture market share will be impaired if it

a different design to the purchaser. "Replacement sales" refers to supplemental purchases of the same design of glassware, regardless of whether the seller previously sold glasses to the buyer.

6. Oneida and Pasabahce assert that initial sales comprise about ten percent of the overall sales in the glassware market. Though I accept this figure as accurate, it potentially is misleading, because it does not relate to the sales of the seven glassware lines at issue in this case. This is true even if, as Oneida and Pasabahce also allege, Libbey is the dominant supplier in the market, and, as Libbey alleges, these seven lines represent a major portion of its sales. Those allegations tell us nothing about Oneida's ability to compete for either initial sales or replacement sales of either new designs or copies of unprotected designs.

cannot lawfully sell its copies of Libbey's patterns to customers who heretofore have bought Libbey's glassware. But Oneida retains the ability to compete fairly, and if it is an effective competitor, to do so successfully, for initial sales. To the extent that it proves itself to be a worthy competitor in making initial sales, it will gain in time a correlative share of the overall market as it makes replacement sales. I conclude, therefore, that competition in the glassware market is not foreclosed if Oneida is unable to make replacement sales by copying the designs at issue.

### b. Competition for Initial Sales

Oneida and Pasabahce also contend, however, that Oneida is effectively foreclosed from competing for initial sales. First, Oneida and Pasabahce claim that "trade-outs" as a way to persuade an end-user to try a new design are prohibitively expensive.[7] This argument is unavailing in light of Libbey's evidence that in the past Oneida used this strategy successfully to introduce unique glassware. (Reidpath Dep., Doc. 130 Ex. 19 at 308–10). Oneida and Pasabahce do not dispute Libbey's evidence.

Second, Oneida and Pasabahce argue that Libbey's Primary Distributor Program (PDP) creates a prohibitive penalty for a purchaser who switches from Libbey to another brand.[8] Oneida and Pasabahce

7. A "trade-out" occurs when a manufacturer induces certain key restaurants in a market to replace their entire inventory with a new pattern which is provided to the restaurant free, or at greatly reduced cost, by the manufacturer. (Reidpath Dep., Doc. 130 Ex. 19 at 306–10; Sysco Corp. Dep. I, Doc. 130 Ex. 16 at 200–03).

8. Libbey's PDP provides incentives for distributors who stock full lines of Libbey glasses. (PDP, Doc. 110 Ex. JJJ at 3). The loyalty provision provides for an increase of up to fifty percent of a distributor's rebates if it does not buy any competitive knock-offs and a fifty percent decrease in rebates if it buys look-alike glasses from a Libbey competitor. (*Id.* at 6).

offer no evidence, however, to support the contention that Oneida must provide "millions of dollars needed to reimburse the distributors for their forfeited PDP Payments." (Doc. 148 at 62). This argument is also unavailing.

Further, the above arguments only apply to end-users who are already buying the designs at issue. Oneida and Pasabahce do not allege that Oneida is unable to compete to first-time glassware purchasers. Moreover, Libbey shows that new designs can and do compete for initial sales, presenting evidence that Cardinal effectively entered the market with its own designs. (Joyce Dep., Doc. 131 Ex. 48 at 61, 229; Kasper Dep., Doc. 131 Ex. 49 at 170; Coleman Dep., Doc. 131 Ex. 50 at 49). Libbey also notes Oneida's sales of its own original designs. (Reidpath Dep., Doc. 130 Ex. 19 at 308–10).

Oneida and Pasabahce have failed to show that Oneida is unable to compete in the initial sale market.

### c. Competition for Total Sales

■ Based on the above discussion, copying is unnecessary to compete for total sales in the relevant market. This application of the "market foreclosure test for functionality" indicates that Libbey's trade dress is non-functional. As to this issue, Oneida's and Pasabahce's motions for summary judgment shall be denied and Libbey's motion for summary judgment shall be granted.

### D. Likelihood of Confusion

■ Finally, Libbey must establish that a likelihood of confusion exists between its trade dress and Oneida's trade dress. In Lanham Act cases, courts use several factors to evaluate the likelihood of confusion: 1) similarity of the parties' trade dresses; 2) strength of plaintiff's trade dress; 3) likely degree of purchaser care; 4) evidence of actual confusion; 5) defendant's intent; 6) relatedness of the parties' goods; 7) marketing channels used; and 8) likelihood of expansion of the product lines. See Esercizio, 944 F.2d at 1241–42. Libbey need not show all, or even most, of these circumstances to prevail at trial. Id. at 1242.

In product configuration cases, however, some factors are more important than others. See generally Versa Products Co. v. Bifold Co., 50 F.3d 189 (3d Cir.1995).[9] Strength of the trade dress, likely degree of purchaser care, evidence of actual confusion, and defendant's intent are given substantial weight. Similarity of the parties' trade dresses, relatedness of the parties' goods, marketing channels used, and likelihood of expansion are necessary but insufficient to prove likelihood of confusion.

### 1. Similarity of the Parties' Trade Dresses

The first factor is similarity of the parties' trade dresses. "[S]ubstantial similarity of appearance is necessarily a prerequisite to a finding of likelihood of confusion in product configuration cases.... [H]owever, a finding of substantial similarity of trade dress in a product configuration does not by itself strongly suggest a likelihood of confusion." See Versa, 50 F.3d at 202. Therefore, substantial similarity is necessary, but insufficient without more, to prove likelihood of confusion.[10]

**9.** In Versa, the Third Circuit provides a lengthy explanation about how to apply its factors in product configuration cases as opposed to other types of Lanham Act cases. Versa, 50 F.3d at 202–09. The Third Circuit's factors differ slightly from the Sixth Circuit's factors, but those differences are immaterial. Compare Versa, 50 F.3d at 202 with Esercizio, 944 F.2d at 1241–42. The analysis in Versa is sound, and I adopt the Third Circuit's reasoning in the absence of contrary Sixth Circuit precedent.

**10.** Libbey claims that this factor is entitled to considerable weight and may even be conclusive of likelihood of confusion. The cases Libbey relies on, however, do not deal with product configuration trade dress. See Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1119 (6th Cir. 1996) (trademark infringement); Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1190–91 (6th

Similarity is necessary because consumer confusion about a product's source would be highly unlikely in its absence. *See id.* at 202. Similarity is insufficient because consumers do not usually rely on distinctive configurations when purchasing products. *See id.* at 202–03. Instead, consumers look to packaging, trademarks, and advertising, which are normally much less ambiguous than the configuration. *See id.*

In the present case, Oneida and Pasabahce do not dispute similarity between Oneida's designs and Libbey's designs. I find that similarity exists and this factor does not preclude a finding of likelihood of confusion.

### 2. Strength of Libbey's Trade Dress

The second factor is strength of Libbey's trade dress. "The strength of a [trade dress] is a determination of [its] distinctiveness and degree of recognition in the marketplace." *Homeowners,* 931 F.2d at 1107. The stronger the trade dress, the greater the likelihood of confusion. *See id.* In the product configuration context, strength

> must mean more than the *ability* of large numbers of consumers to identify the configuration as coming from a particular producer. . . .
>
> Rather, "strength" of product configuration as relevant to determining likelihood of confusion on the part of ordinarily careful consumers should be found only if consumers *rely* on the product's configuration to identify the producer of the good.

*Versa,* 50 F.3d at 203 (emphasis in original).

To show strength, Libbey reiterates its claim of distinctiveness. As discussed earlier, there is a genuine issue of material fact about whether Libbey's trade dress has secondary meaning.

In any event, Libbey must prove more than secondary meaning for this factor to weigh in its favor. A finding of secondary meaning merely indicates that consumers associate the configuration with a single source. *See Two Pesos,* 505 U.S. at 766 n. 4, 112 S.Ct. 2753. Such a finding does not necessarily indicate that "consumers *rely* on the product's configuration to identify the producer of the good." *Versa,* 50 F.3d at 203 (emphasis in original). Consumers may instead rely, as Oneida and Pasabahce claim, on packaging or a backstamp as the source indicator.

The evidence with respect to strength of Libbey's trade dress is inconclusive. I cannot determine whether this factor increases or decreases likelihood of confusion.

### 3. Likely Degree of Purchaser Care

The third factor is likely degree of purchaser care. Likely degree of purchaser care "takes on enhanced importance when a claim is made for infringement of trade dress in a product configuration." *Versa,* 50 F.3d at 204. A lower degree of purchaser care increases the likelihood of confusion. *See Wynn Oil Co. v. American Way Service Corp.,* 943 F.2d 595, 602 (6th Cir.1991).

According to Libbey, a variety of factors contribute to a low degree of purchaser care.[11] First, the product is allegedly inexpensive at only seventeen dollars per case. Second, the nature of the purchasing process allegedly results in a low level of care, particularly because: 1) end-users order through distributors who sometimes

Cir.1988) (trademark infringement); *Homeowners Group, Inc. v. Home Marketing Specialists,* 931 F.2d 1100, 1107 n. 4 (6th Cir. 1991) (service mark infringement). Thus, I shall weigh this factor according to the Third Circuit's suggestion in *Versa.*

**11.** During its discussion of purchaser care, Libbey argues at length about Oneida and Pasabahce's liability for "substitutions" of glassware. (Doc. 128 at 75–84; Doc. 154 at 27–32). Libbey seems to forget that Oneida and Pasabahce's liability for any activity depends upon proof of a protectable trade dress which includes proof of likelihood of confusion. Libbey's argument has no place in this portion of the analysis.

substitute glasses and who often use unmarked boxes for shipping; 2) purchasers often order at the last minute; and 3) the person who places the order is not necessarily the person who receives the order. Third, Oneida's incentive program, whereby distributors receive rebates for selling knock-off glassware, allegedly encourages confusion.

Oneida and Pasabahce respond by pointing out that the process of ordering involves several opportunities to specify or learn the source of glassware, including catalogs, boxes, or invoices. After ordering and delivery, the source is ascertainable from a permanent backstamp. "Because clear labeling ... should generally be legally and factually sufficient to remedy confusion where unpatented product configurations are at issue, clarity of labeling (and marketing) must be taken into account in considering whether there is a likelihood that consumers *exercising ordinary care* will be confused as to the sources of substantially identical products." *Versa*, 50 F.3d at 204 (emphasis in original).

Libbey's answer with respect to clarity during ordering is that over fifty percent of Oneida's allegedly infringing glassware will be sold under a private label arrangement with Sysco. Thus, Sysco will ship the private label glassware, known as SyscoBrand, in boxes and with invoices devoid of any reference to Oneida.

There is a problem with Libbey's argument. The absence of a reference to Oneida does not necessarily make labeling and marketing unclear. A reference to SyscoBrand or Sysco is just as clear as a reference to Oneida unless Sysco customers believe that Sysco's glassware, regardless of its boxes and invoices, always comes from Libbey. Libbey presents no evidence that Sysco customers hold this belief.

With respect to clarity after ordering and delivery, Libbey claims that backstamps do not alleviate confusion. Libbey presents evidence that end-users do not look at the backstamps on a regular basis. (Williams Dep., Doc. 127 Ex. 25 at 106 and 114–15; Thomas Expert Report, Doc. 127 Ex. 28 at 3; Kimmons Dep., Doc. 127 Ex. 20 at 163). Further testimony from the same end-users, however, shows that end-users do look at backstamps when they want to determine the manufacturer. When asked to whom he would attribute a glass with a crooked stem, Mr. Williams stated that although he would initially assume the glass was Libbey's he "would probably flip it over ... just to double-check, see the name." (Williams Dep., Doc. 127 Ex. 25 at 114). Mr. Thomas reported that end-users inspect their glassware if "they have reason to believe that something is out of the ordinary." (Thomas Expert Report, Doc. 127 Ex. 28 at 3). Mr. Kimmons stated that end-users can tell the difference between glasses by "turn[ing] them over and look[ing] at the back stamp on the bottom." (Kimmons Dep., Doc. 127 Ex. 20 at 163).

Libbey also presents evidence that at least one year's worth of Oneida's glasses do not contain backstamps and that the Nob Hill and Facets lines will never contain backstamps. (Reidpath Dep., Doc. 127 Ex. 11 at 69; Mackenzie Dep., Doc. 127 Ex. 21 at 249; McGrogan Dep., Doc. 127 Ex. 2 at 303). Oneida and Pasabahce do not dispute this evidence.

Finally, Libbey claims that the backstamps, which are located on the bottom of the glasses, are not visible during normal use and may be imperceptible because they are too light or may be obliterated when a glass breaks. (Sysco Dep. II at 147; Zitkus Dep., Ex. 30 at 57–58).[12] Libbey's evidence as to normal use is inconclusive given the discussion above, namely

---

12. Libbey also claims that, because Oneida's backstamp is not one of Oneida's traditional trademarks, purchasers will not know the origin of glassware bearing that stamp. Purchasers will know, however, that the glasses do not come from Libbey. Therefore, I find this argument unpersuasive.

that end-users pick up glasses to look at the backstamp when they have a question about source. Libbey's evidence as to imperceptibility applies to Anchor's backstamps, not Oneida's backstamps. (Sysco Dep. II, Doc. 127 Ex. 34 at 147). Libbey's evidence regarding breakage is speculative.

The present record is not determinative on the effect of Oneida's labeling and marketing on the likely degree of purchaser care. Therefore, I cannot resolve whether this factor increases or decreases a likelihood of confusion.

### 4. Evidence of Actual Confusion

The fourth factor is evidence of actual confusion. Proof of actual confusion can strengthen a trade dress owner's case, but "is not required for a successful trade dress infringement action." *Versa*, 50 F.3d at 205. The Sixth Circuit recognizes that evidence of actual confusion is difficult to obtain. *See Wynn Oil Co.*, 839 F.2d at 1188.

Libbey argues that, given Oneida's recent entry into the market, instances of actual confusion are unlikely. Libbey also produces evidence of one occurrence of alleged actual confusion, noting that even a single instance may favor Libbey to some extent. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 284 (6th Cir.1997). According to Libbey, an end-user in Minnesota who used both Libbey and Oneida glassware complained about excessive glass breakage. Libbey claims that the end-user could not determine whether the Libbey or Oneida glasses were breaking.

The distributor's testimony about this incident, however, does not support Libbey's contention. (Sysco Dep. II, Doc. 131 Ex. 55 at 137–139). When asked if the end-user was using a specific Libbey line of glassware, the distributor "did not know that for a fact." (*Id.* at 137). When asked if the end-user was even using a Libbey product, the distributor said he "believe[d] so," but later testified that he "wasn't sure

if it was a Libbey product or not." (*Id.* at 137–38.)

There is no conclusive evidence of actual confusion, and I cannot determine whether this factor increases the likelihood of confusion.

### 5. Oneida's Intent

The fifth factor is Oneida's intent. "[I]n the product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading." *Versa*, 50 F.3d at 208.

Libbey relies on four arguments to show Oneida's intent: 1) Oneida copied even though it recognized acquired distinctiveness; 2) Oneida copied as closely as it believed the law would allow; 3) the prospect of financial gain precipitated Oneida's copying; and 4) Oneida marketed its glassware as easily interchangeable with Libbey glassware.

Even if I assume that Libbey's first three arguments show intent to confuse or deceive, I must also find that Oneida's labeling and marketing are affirmatively misleading. Only Libbey's fourth argument addresses this issue, and it is inconclusive because the marketing strategies may simply promote competition and are not necessarily misleading.

I am unable to determine whether this factor increases or decreases likelihood of confusion.

### 6. Marketing Considerations

The three remaining factors address various aspects of marketing: relatedness of the parties' goods, marketing channels, and expansion of product lines to compete. "In the product configuration context, none of these [marketing] factors tends to establish a probability of confusion ... [and] they should be treated as necessary but insufficient conditions for showing a likelihood of confusion." *Versa*, 50 F.3d at

208.[13] Therefore, Libbey must show that the Libbey and Oneida glasses at issue are related, are sold in the same marketing channels, and will compete. Absence of any of these showings will preclude a finding of likelihood of confusion.

There is no dispute that Oneida's glassware inventory is directly related to Libbey's and is sold through identical marketing channels. Further, expansion of product lines is irrelevant because the glasses at issue already compete. *See Daddy's Junky Music*, 109 F.3d at 287 (finding relevance in the expansion of one business to compete with another business).

Relatedness, identical marketing channels, and competition are present and these factors do not preclude a finding of likelihood of confusion.

### 7. Evaluation of Factors

■ While no factor precludes a finding of likelihood of confusion, several factors are inconclusive. I cannot determine the strength of Libbey's trade dress, the likely degree of purchaser care, or the effect of Oneida's intent in light of labeling and marketing. There are, accordingly, several genuine issues of material fact about likelihood of confusion. Therefore, Oneida's, Pasabahce's, and Libbey's motions for summary judgment are denied as to this issue.

### II. State Infringement Claim

■ In Count Two, Libbey brings an infringement claim pursuant to the Ohio Deceptive Trade Practices Act. The parties agree that analysis under this Act and the Lanham Act is the same. (Doc. 103 at 70; Doc. 128 at 94). *See also OmniAmerica Group v. Street Gold Records, Ltd.*, 916 F.Supp. 672, 678 (N.D.Ohio 1996). Thus, Oneida's, Pasabahce's, and Libbey's motions for summary judgment of Libbey's state infringement claim shall be granted

13. Again, Libbey claims that these factors are entitled to more significant weight, yet the cases Libbey relies on do not deal with product configuration trade dress. *See e.g., Dad-*

in part and denied in part as described above.

### III. Federal Dilution Claim

In Count Three, Libbey brings a claim for dilution under the Lanham Act. The Lanham Act provides:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). Dilution does not depend on the presence of competition between the parties or on likelihood of confusion. *See* 15 U.S.C. § 1127.

■ Thus, Libbey must establish: 1) its trade dress is distinctive; 2) its trade dress is non-functional; 3) its trade dress is famous; 4) Oneida is using the trade dress in commerce; 5) Oneida began such use after the trade dress became famous; and 6) Oneida's use dilutes the distinctive quality of the trade dress. *See* 15 U.S.C. § 1125(c)(1); *see also I.P. Lund Trading v. Kohler Co.*, 163 F.3d 27 (1st Cir.1998) ("The requirements of commercial use, non-functionality, and distinctiveness are common to both the [trade dress] infringement claim and the [federal] dilution claim.")

### A. Distinctiveness

First, Libbey must establish that its trade dress is distinctive. As discussed above, Libbey's trade dress is not inherently distinctive and there is a genuine issue of material fact about whether Libbey's trade dress has secondary meaning.

*dy's Junky Music*, 109 F.3d at 285 (trademark infringement). Thus, I shall weigh these factors according to the Third Circuit's suggestion in *Versa*.

## B. Non-functional

Second, Libbey must establish that its trade dress is non-functional. As discussed above, Libbey's trade dress is non-functional.

## C. Famous

Third, Libbey must establish that its trade dress is famous. The Lanham Act provides a non-exclusive list of eight factors that courts may consider when determining whether a mark is distinctive and famous. *See* 15 U.S.C. § 1125(c)(1). The factors are:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used; [14]

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1)(A)-(H) (footnote added).

■■■ The first factor, distinctiveness, is a necessary condition of famousness. *See I.P. Lund,* 163 F.3d at 47 (*quoting* 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 24:91 (4th ed.1996); J. Gilson, Trademark Protection and Practice § 5.12[1][c][ii] (1998)). Further, "[b]oth the Restatement (Third) of Unfair Competition and the state anti-dilution statutes against the background of which Congress enacted [§ 1125(c) of the Lanham Act] make clear that the standard for fame and distinctiveness required to obtain anti-dilution protection is more rigorous than that required to seek infringement protection." *Id.* at 47.

Because there is a genuine issue of material fact about whether Libbey's trade dress is distinctive, there is also a genuine issue of material fact about whether the trade dress is famous.

## D. Use in Commerce

Fourth, Libbey must establish that Oneida is using the trade dress in commerce. Oneida and Pasabahce claim that, because Oneida is not affirmatively using the trade dress to identify Oneida as the source of the glassware, Oneida is not using the trade dress in commerce.

Oneida and Pasabahce offer no support for the proposition that Oneida must affirmatively use the trade dress as a source indicator. Therefore, there is at least a genuine issue of material fact as to whether Oneida uses the trade dress in commerce.

## E. Use Began after Famous

Fifth, Libbey must establish that Oneida's use began after the trade dress became famous. Because I cannot determine whether Libbey's trade dress is famous, there is a genuine issue of material fact as to whether Oneida's use began after the trade dress became famous.

---

**14.** Oneida and Pasabahce claim that a famous trade dress must be known to the general public rather than to those in the relevant channels of trade. (Doc. 103 at 66). The statute itself does not support such a conclusion, nor do the cases cited by Oneida and Pasabahce. *See e.g., Mead Data Cent., Inc. v.* *Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir.1989). Instead, a trade dress must be famous in the channels used by the dress's owners and the person against whom the injunction is sought. *See* 15 U.S.C. § 1125(c)(1)(F).

## F. Dilution

Sixth, Libbey must show that Oneida's use dilutes the distinctive quality of the trade dress. Dilution may occur through blurring or tarnishment. Libbey claims that both occur in the present case.

■ Libbey claims that Oneida's use of its trade dress results in blurring. "Dilution by blurring occurs 'when a defendant uses a plaintiff's [trade dress] to identify the defendant's goods or services, creating the possibility that the [dress] will lose its ability to serve as a unique identifier of the plaintiff's product.'" *Times Mirror Magazines, Inc. v. Las Vegas Sports News*, 50 U.S.P.Q.2d 1454 (E.D.Pa.1999). (citations omitted). According to Libbey, Oneida's trade dress use fits within this definition.

In response, Oneida and Pasabahce argue that blurring only occurs when the defendant uses the plaintiff's trade dress on a product that the plaintiff does not sell. Oneida and Pasabahce, however, offer no support for this proposition and no further arguments. There is a genuine issue of material fact about whether Oneida's use of the trade dress results in dilution through blurring.

■ Additionally, Libbey claims that Oneida's use of its trade dress results in tarnishment. Tarnishment occurs when the goodwill and reputation of a plaintiff's trade dress are linked to products which will "conjure associations that clash with the associations generated by the owner's lawful use of the mark." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 31 (1st Cir.1987). According to Libbey, Oneida's glassware is of a lower quality and has different performance characteristics than Libbey's glassware.

Oneida and Pasabahce dispute Libbey's characterization of its product as lower in quality. Libbey, however, raises a genuine issue of material fact about whether Oneida's use of the trade dress results in dilution through tarnishment.

## G. Summary

■ There are genuine issues of material fact about the following elements of Libbey's claim: distinctiveness; famousness; use in commerce; fame before use; and dilution through blurring and tarnishment. Therefore, Oneida's and Pasabahce's motions for summary judgment as to Libbey's dilution claim shall be denied.

## IV. Affirmative Defenses

Oneida and Pasabahce assert three affirmative defenses to Libbey's claims: laches, estoppel/waiver, and unclean hands. (Oneida Answer, Doc. 127 Ex. 37 at 8; Pasabahce Answer, Doc. 127 Ex. 36 at 9).

### A. Laches and Estoppel/Waiver

■ Oneida and Pasabahce base their laches and estoppel/waiver defenses on the allegation that, "for roughly twenty years, so-called knock-offs or look-a-likes of the very glassware at issue in this lawsuit have been offered by other manufacturers for sale in the United States in competition with Libbey." (Doc. 138 at 18).

Libbey argues that even if the above allegation is true, Oneida and Pasabahce cannot succeed because laches is a personal defense concerning the effects of Libbey's acts on Oneida and Pasabahce specifically. *See* 2 McCarthy § 17:17; 5 McCarthy § 31:43. Therefore, Libbey contends, inaction with respect to third parties bears no relevance. *See Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991) ("[a] plaintiff's failure to assert [trade dress] rights against third parties is not relevant to the defense[ ] of laches").

Libbey makes the same argument with respect to estoppel/waiver, or acquiescence.[15] *See* 2 McCarthy § 17:17; 5 McCarthy § 31:43. Acquiescence requires

---

15. While Oneida and Pasabahce describe one of their affirmative defenses as "estoppel and waiver," the only case they rely on deals with estoppel by acquiescence. *See National Business Lists*, 552 F.Supp. at 98. Therefore, I will treat this defense as estoppel by acquiescence.

"a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Elvis Presley Enters.*, 936 F.2d at 894 (citation omitted). Therefore, Libbey's alleged delay in prosecuting other infringers has no relevance to its claim of estoppel/waiver. *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984); *see also Elvis Presley Enters.*, 936 F.2d at 894.

Oneida and Pasabahce stand behind their contention that action or inaction "with respect to an entire industry, and reliance on such action or inaction by a new entrant to the market thus created, results in an estoppel." (Doc. 138 at 19). They rely on *National Business Lists, Inc. v. Dun & Bradstreet, Inc.*, 552 F.Supp. 89, 97–98 (N.D.Ill.1982).

*National Business Lists* does not support the proposition suggested by Oneida and Pasabahce. In fact, I agree with the Southern District of New York's specific rejection of their proposed reading of the case:

> Defendants' reliance on *National Business Lists* ... is unavailing. In that case, the plaintiff expressly permitted the allegedly wrongful conduct of both the defendant as well as other parties. The defendant's reliance, therefore, was based, at least in part, on plaintiff's acquiescence to the defendant's own conduct. In the instant case, defendants are relying entirely on Paramount's conduct towards others. Defendants have therefore failed to document a prima facie case for their affirmative defenses.

*Paramount Pictures Corp. v. Carol Publ'g Group*, 11 F.Supp.2d 329, 337–38 (S.D.N.Y. 1998) (citation omitted).

In the present case, Oneida and Pasabahce make no allegation that Libbey permitted their allegedly wrongful conduct. Oneida's and Pasabahce's allegations relate only to third parties. There is no genuine issue of material fact with respect to laches or estoppel/waiver. Libbey's mo-

tion for summary judgment shall be granted as to these affirmative defenses.

### B. Unclean Hands

Oneida and Pasabahce base their unclean hands defense on the allegation that "Libbey's action and request for injunctive relief are apparently being used as an attempt to force Oneida into a merger or other combination with Libbey." (Oneida's Interr. Resp., Doc. 127 Ex. 38 at 14; Pasabahce's Interr. Resp., Doc. 127 Ex. 39 at 14).

Libbey argues that even if true, this allegation does not support an unclean hands defense. "The doctrine of unclean hands requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir.1995). Unclean hands does not apply to a party's motives for bringing a lawsuit. *See Pierce v. Apple Valley, Inc.*, 597 F.Supp. 1480, 1485 (S.D.Ohio 1984).

Oneida and Pasabahce respond by offering an alternative basis for their unclean hands defense. They claim that Libbey's "failure to enforce claimed intellectual property rights against users other than [themselves] amounts to 'inequitable conduct in the use of the right that is the subject matter' of the lawsuit, and thus establishes an affirmative defense of unclean hands." (Doc. 138 at 20 n. 14) (quoting *Sears, Roebuck & Co. v. Sears*, 744 F.Supp. 1297, 1310 (D.Del.1990)). Oneida and Pasabahce do not explain, however, why an alleged failure to enforce trade dress rights against third parties constitutes wrongful conduct.

Therefore, Oneida and Pasabahce fail to raise a genuine issue of material fact about their unclean hands defense. Libbey's motion for summary judgment shall be granted as to this affirmative defense.

### Conclusion

For the foregoing reasons, it is hereby

**ORDERED THAT**

Oneida's, Pasabahce's, and Libbey's motions for summary judgment (Docs.102, 113, 125) shall be, and hereby are, granted in part and denied in part as follows:

1. Oneida's and Pasabahce's motions for summary judgment are granted as to the issue of inherent distinctiveness and are denied as to all other issues.

2. Libbey's motion for summary judgment is granted as to the issues of proper trade dress definition, nonfunctionality, and the affirmative defenses of laches, estoppel/waiver, and unclean hands and are denied as to all other issues.

3. Genuine issues of material fact remain as to secondary meaning, likelihood of confusion, famousness; use in commerce; fame before use; and dilution through blurring and tarnishment.

**So ordered.**